## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

YOLONDA DICKERSON,      )
     )
         Plaintiff,      )
     )
     v.      )     C.A. No. 16-657-RGA-MPT
     )
KEYPOINT GOVERNMENT      )
SOLUTIONS, INC.,      )
     )
         Defendant.      )

### REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On August 1, 2016, Yolonda Dickerson ("plaintiff") filed this action against

KeyPoint Government Solutions, Inc. ("defendant"), alleging adverse actions amounting

to discrimination and retaliation prohibited under the Americans with Disabilities Act

("ADA") and Title VII of the Civil Rights Act of 1964.[1]  Plaintiff was employed by

defendant from March 24, 2008 to April 16, 2014.[2]  During her employment, plaintiff

filed her first Charge of Discrimination with the Equal Employment Opportunity

Commission ("EEOC") on October 22, 2012 ("the 2012 Charge").[3]  She filed her second

Charge of Discrimination on July 29, 2014 after her termination ("the 2014 Charge").[4]

On September 2, 2016, defendant filed its Answer to the Complaint and then

filed a motion for leave to amend its Answer to the Complaint on February 1, 2017.[5]

---

[1] D.I. 1.
[2] D.I. 58, Ex. A; D.I. 57, Ex. T.
[3] D.I. 57, Ex. J.
[4] D.I. 58, Ex. NN.
[5] D.I. 8; D.I. 33.

DISTRICT OF DELAWARE
CLERK U.S. DISTRICT COURT
FILED

2017 JUL 18  AM 8: 29

The motion for leave to amend the Answer to the Complaint was denied by this court on June 7, 2017.[6]

Presently before the court are the parties' cross motions for summary judgment, which were both filed on May 15, 2017.[7]  For the reasons stated below, it is recommended that the plaintiff's motion be denied and the defendant's motion be granted.

## II.    BACKGROUND

Plaintiff, an African American woman, worked as a level I field investigator for defendant from March 2008 to April 2014.[8]  Defendant provides employment-screening services to government agencies through field investigators.[9]  Investigators are typically assigned to work areas in close proximity to where they live, though field managers sometimes ask investigators to undertake temporary duty ("TDY") assignments outside their regular work areas.[10]  Investigators based in work areas designated for "locality pay" are paid a higher hourly rate than those that are not.[11]  Typically, one investigator works a case to completion, though several investigators may work on a case if interviewees and documents are spread over multiple investigators' work areas.[12]  Work may be reassigned to a new investigator if the original investigator is unavailable.[13]

Plaintiff's job required her to spend many hours writing and typing, and in March

---

[6] D.I. 62.
[7] See generally D.I. 53; D.I. 55.
[8] D.I. 56 at 3, 18; D.I. 54 at 1.
[9] D.I. 57, Ex. A at 29-30.
[10] D.I. 54 at 3; D.I. 57, Ex. A at 122-41.
[11] D.I. 54 at 3; D.I. 57, Ex. A at 126-29.
[12] D.I. 54 at 2; D.I. 57, Ex. C at 18-9.
[13] D.I. 54 at 2; D.I. 57, Ex. B at 41, Ex. C at 18-9.

2011, she began experiencing pain in her fingers, hands, wrists, and arms.[14]  On March 17, 2011, she was diagnosed with work-related Carpal Tunnel Syndrome ("CTS") in both wrists.[15]  Her doctor prescribed physical therapy sessions and suggested an ergonomic keyboard, mouse, and wrist braces for work.[16]  Plaintiff reported her disability to her field manager, Debra Williams, on the same day of her diagnosis and requested reimbursement for the ergonomic keyboard and mouse suggested by her doctor.[17]  Plaintiff was directed to Kristi Orton, the Human Resources Manager, to seek reimbursement.[18]  Plaintiff provided Orton with all of the medical documents she had provided Williams, in addition to her physical therapist's written confirmation of her physician's concerns.[19]  Ultimately, plaintiff never received a response regarding her reimbursement request.[20]  On November 22, 2011, plaintiff notified defendant of her doctor's recommendation that she be placed on light duty status with a "smaller caseload" for approximately one month.[21]  A few days later, Orton inquired what a "smaller caseload" meant and, on November 28, 2011, Orton informed plaintiff that her accommodation requests were denied.[22]  The next day, plaintiff's physician released her back to work without restriction.[23]

---

[14] D.I. 57, Ex. D.
[15] D.I. 56 at 3; D.I. 60, Ex. A.
[16] D.I. 60, Ex. A.
[17] *Id.*
[18] *Id.*
[19] D.I. 58, Ex. G.
[20] D.I. 56 at 3-5.
[21] D.I. 60, Ex. D.
[22] D.I. 60, Ex. E; D.I. 56 at 5.
[23] D.I. 54 at 5; D.I. 57, Ex. A at 414.

### A.    TDY Assignments

On December 20, 2011, Blair Sims, plaintiff's field manager at the time, asked plaintiff to undertake a TDY assignment in Springfield, Virginia.[24]  Plaintiff said she could not go on this assignment because she was caring for her daughter, continuing medical treatment, and worried about her ill aunt.[25]  Jenise Fuson, defendant's Chief Personnel Officer, asked plaintiff for documentation reflecting her medical treatment.[26]  Plaintiff asserts Colleen Carey ("Ms. Carey"), a Caucasian coworker, asked to be excused to care for her child and was excused without being required to provide similar documentation.[27]

On May 23, 2012, Robert Sellers, plaintiff's then field manager, asked for volunteers for a TDY assignment in Las Vegas and plaintiff volunteered the same day.[28]  Although Sellers advised that she should prepare to travel for this TDY, he ultimately did not select the investigators for the assignment; rather Garth Gardner, the field manager for the Las Vegas area, did.[29]  Gardner emailed plaintiff and Ms. Carey on May 29, 2012, informing them that they were instead assigned to Bremerton, Washington.[30]  Ms. Carey told Gardner she could not go to Bremerton for family reasons.[31]  Plaintiff also asked to be removed from the Bremerton TDY because she

---

[24] D.I. 54 at 5; D.I. 57, Ex. A at 147.
[25] D.I. 54, Ex. J.
[26] *Id.*
[27] D.I. 54 at 6.
[28] D.I. 60, Ex. R.
[29] D.I. 57, Ex. H at ¶ 17; Ex. I.
[30] D.I. 60, Ex. N.
[31] D.I. 54, Ex. A at 156.

intended to spend her birthday in Las Vegas.[32] Ms. Carey was excused, while plaintiff was informed her assignment in Bremerton was "non-negotiable."[33]

### B.    Workload Complaints

Around March 2012, plaintiff began to complain of a reduced workload and claims her workload remained improperly reduced until October 2013.[34] In August 2013, plaintiff informed defendant of her move from Severn, Maryland to Millsboro, Delaware.[35] Defendant was notified *after* plaintiff had moved, which was contrary to defendant's company policy.[36] Plaintiff's new residence in Delaware was not within an area entitled to "locality pay," while her old residence in Maryland was.[37] However, defendant continued to pay plaintiff at the higher rate after her move and while she worked cases in Fort Meade, Maryland.[38]

After this move, plaintiff was the only full-time investigator in Delaware.[39] Her workload supervisor, Stephen Mullane, therefore assigned her work in places along her commute from Millsboro to Fort Meade.[40] Starting in October 2013, plaintiff received additional work assignments originally assigned to her white male colleagues that were deemed to be along her commute.[41] On November 8, 2013, plaintiff informed the Regional Field Director, Lauren Parker, of her concerns of being overworked and

---

[32] D.I. 57, Ex. I.
[33] D.I. 60, Ex. O-Ex. P.
[34] D.I. 54 at 7; Ex. A at 166-69.
[35] D.I. 54, Ex. A at 261, 269.
[36] *Id.* at 269.
[37] D.I. 54, Ex. A at 269-70.
[38] *Id.*
[39] D.I. 54, Ex. C at 26.
[40] *Id.* at 28-9.
[41] D.I. 56 at 7-8; Ex. U-Ex. V.

5

receiving work originally assigned to her colleagues.[42]  Mullane was advised on three

separate occasions to stop reassigning work to plaintiff and to only give her work in Fort

Meade, but he continued with the reassignments to plaintiff.[43]  Plaintiff suspected

Mullane was retaliating against her, given their heated email exchanges, and

approached Orton and Parker with her concerns.[44]  In response, Orton allegedly

laughed at plaintiff when she asked whether retaliation through workload was

possible.[45]

Plaintiff's move to Delaware and the increased commute time caused defendant

to incur overtime and reimbursement costs.[46]  Therefore, on March 25, 2014, Parker

and Orton decided to formally transfer plaintiff to work in Delaware.[47]  Plaintiff was

anticipating a pay reduction when she was officially transferred because her area in

Delaware was not entitled to locality pay.[48]

### D.    Termination

On April 15, 2014, Parker told plaintiff that Human Resources wanted to set up a

formal conversation via teleconference with her on the following day.[49]  Plaintiff refused

to speak with Parker, requesting that all communications be conducted in writing.[50]

---

[42] D.I. 56, Ex. Y.

[43] D.I. 56, Ex. BB.

[44] D.I. 54 at 9; D.I. 57, Ex. M.

[45] D.I. 54, Ex. A at 295.

[46] D.I. 54, Ex. U.

[47] D.I. 54, Ex. U-Ex. V.

[48] Id.

[49] D.I. 57, Ex. S.

[50] D.I. 57, Ex. R (plaintiff responded to a notification of a formal conversation with Human Resources: "I'm not going to endure that agony again where everyone on the call but me is in cahoots together.  I have no interest in verbally speaking with anyone who laughs at me and questions if retaliation through work is even possible.  At this

Plaintiff was informed that her attendance was mandatory.[51]  After failing to call into the conference, plaintiff was warned that if she did not join the teleconference, she would be terminated.[52]  Plaintiff refused to join the call and was terminated the same day.[53]

### C.    Performance Evaluations

Defendant has a policy of providing quarterly evaluations to field investigators, who were to complete their portion of the review before submitting it to their manager.[54] After an employee completed and submitted her portion of the evaluation, the supervisor was expected to complete his portion within two to three weeks.[55]  Plaintiff received regular quarterly performance reviews between 2008 and 2011.[56]  After plaintiff's diagnosis in 2011, plaintiff's supervisors stopped completing their portion of the evaluation.[57]  Plaintiff did not receive completed performance evaluations between 2011 and 2014, with one exception, a fourth quarter evaluation in 2013.[58]  This evaluation was executed three months after it was submitted and includes negative comments regarding plaintiff's productivity.[59]

---

point, everything that needs to be said to me shall be in writing"). *See also* D.I. 57, Ex. T (plaintiff responded to final warnings to join the teleconference: "You are attempting to coerce me.  Where is this written?  Feel free to take the steps you feel are necessary to get your desired outcome for refusing to speak with you verbally.  Have a nice day").

[51] D.I. 57, Ex. S-Ex. T.
[52] D.I. 57, Ex. T.
[53] *Id.*
[54] D.I. 58, Ex. D at 47-8.
[55] *Id.*
[56] D.I. 58, Ex. HH.
[57] *Id.*
[58] *Id.*; D.I. 58 at 10-11.
[59] D.I. 58 at 10-11, Ex. HH.

## III.    STANDARD OF REVIEW

Both parties move for summary judgment.  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[60]  If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[61]

This standard does not change merely because there are cross-motions for summary judgment.[62]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[63]

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[64]

Claims under Title VII and ADA are evaluated under a burden-shifting analysis.[65] First, a plaintiff must establish a prima facie case of discrimination.[66]  Once a prima facie case of discrimination has been established, the defendant must articulate a

---

[60] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).

[61] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[62] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[63] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[64] *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

[65] *Mowafy v. Noramco of Delaware, Inc.*, 620 F. Supp.2d 603, 611 (D. Del. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[66] *Id.* (citing *McDonnell*, 411 U.S. at 802).

"legitimate, nondiscriminatory reason" for its conduct.[67]  Thereafter, the burden shifts

back to the plaintiff, who must point to evidence from which the "factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)

believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action."[68]  To so demonstrate, plaintiff must show

a defendant's reasons are "so weak, incoherent, implausible, or inconsistent such that

they lack credibility."[69]

## IV.    DISCUSSION

### A.    Plaintiff's Motion for Summary Judgment

#### 1.    Disability Discrimination and Failure to Accommodate

To establish a prima facie case of discrimination, plaintiff must show:  "(1) he or

she was a member of a statutorily-protected class; (2) he or she was qualified for the

position; (3) he or she was aggrieved by an adverse employment action; and (4) the

adverse employment action occurred under circumstances giving rise to an inference of

illegal discrimination."[70]

Here, defendant concedes the first three prongs of prima facie discrimination,

and the parties disagree only on the fourth prong.[71]  Plaintiff claims defendant's failure

to make reasonable accommodations constitute an adverse employment action.[72]

Additionally, plaintiff avers defendant's failure to participate in the "interactive process"

---

[67] *Id.* (quoting *McDonnell*, 411 U.S. at 802).
[68] *Id.* at 612 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).
[69] *Id.* (citing *Fuentes*, 32 F.3d at 765).
[70] *Venter v. Potter*, 694 F. Supp.2d 412, 422 (W.D. Pa. 2010).
[71] D.I. 54 at 12-3.
[72] D.I. 56 at 15-6.

indicates illegal discrimination based on her disability.[73]  Plaintiff addresses only the

following claims in her motion for summary judgment:  disability discrimination, failure to

accommodate, and sex-based and racial discrimination.[74]

To establish a prima facie failure to accommodate, an employee must prove:

"(1) she is an individual with disability under the ADA; (2) she can perform the essential

functions of her position with accommodation; (3) her employer had notice of her

alleged disability; and (4) the employer failed to accommodate her."[75]  Plaintiff contends

defendant failed to accommodate her by not reimbursing her and denying her request

for a smaller caseload.[76]  In response, defendant argues plaintiff's failure to

accommodate claim is time-barred.[77]  A plaintiff must file a charge of discrimination with

the EEOC "within 300 days of an alleged discriminatory act before the plaintiff can

initiate a civil suit in federal court."[78]  This 300-day statute of limitations to file an EEOC

charge begins at the denial of a request for accommodation.[79]

In her response to defendant's motion, plaintiff argues defendant's actions were

part of a continuous practice, and therefore, her claim is not time-barred under a

---

[73] *Id.* at 16-7.
[74] *See generally* D.I. 56.  *See also* D.I. 1 at 11-5 (Complaint claiming disability discrimination, racial discrimination, sex-based discrimination, retaliation, hostile work, and breach of the covenant of good faith and fair dealing).
[75] *Conneen v. MBNA America Bank, N.A.*, 182 F. Supp.2d 370, 376-77 (D. Del. 2002) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001); *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999))
[76] D.I. 56 at 15-6.
[77] D.I. 57 at 10.
[78] *Zdziech v. DaimlerChrysler Corp.*, 2003 U.S. Dist. LEXIS 9425, at *3 (D. Del. June 6, 2003) (citing 42 U.S.C. § 2000e-5(e)(1); *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1210 (3d Cir. 1984)).
[79] *See Mercer v. Southeastern Pennsylvania Transit Authority*, 26 F. Supp.3d 432, 442 (E.D. Pa. 2014).

"continuing violation theory."[80] Under this theory, if the conduct in question "is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."[81] Defendant's failure to reimburse plaintiff and denial of her request for a reduction in workload occurred in 2011.[82] Plaintiff again requested a reduced workload three years later, in 2014, which was allegedly ignored.[83] These three occurrences over a period of three years do not amount to a continuing practice, but are isolated incidents.[84] Therefore, the continuing violation theory does not apply.[85] Instead, plaintiff's failure to accommodate claim must be analyzed under the traditional 300-day statute of limitations.[86] Defendant did not reimburse plaintiff for her ergonomic equipment in March 2011 and denied her request for a smaller workload on November 28, 2011.[87] Plaintiff filed her first EEOC charge on November 9, 2012.[88] Both defendant's failure to reimburse plaintiff and denial of her request for a smaller workload occurred more than 300 days before she filed the 2012 Charge.[89] Because the 300-day statute of limitations to file an EEOC charge begins with the denial of a

---

[80] D.I. 58 at 25-6.

[81] *Malone v. Specialty Products & Insulation Co.*, 85 F. Supp.2d 503, 505 (E.D. Pa. 2000) (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners*, 927 F.2d 1283, 1295 (3d Cir. 1991)).

[82] D.I. 56 at 4-5; D.I. 60, Ex. E, Ex. L.

[83] D.I. 58 at 26, Ex. P.

[84] *See Malone*, 85 F. Supp.2d at 506 (citing *Rush v. Scott Specialty Gases*, 113 F.3d 476, 483 (3d Cir. 1997)).

[85] *See id.* at 505.

[86] *Zdziech v. DaimlerChrysler Corp.*, 2003 U.S. Dist. LEXIS 9425, at *3 (D. Del. June 6, 2003) (citing 42 U.S.C. § 2000e-5(e)(1)).

[87] D.I. 56 at 4-5; D.I. 60, Ex. E, Ex. L.

[88] D.I. 57, Ex. J.

[89] *Compare id. with* D.I. 56 at 4-5; D.I. 60, Ex. E, Ex. L.

request for accommodation, her accommodation claim is time-barred.[90]

Secondly, plaintiff argues defendant failed to participate in the interactive process.[91]  Employers and employees have a duty to engage in the "interactive process":  identifying potential accommodations that could allow the disabled worker to continue working.[92]  An employee can establish her employer failed to participate in the interactive process by showing:  "(1) the employer knew about the employees disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith."[93]  However, the "[f]ailure to engage in the interactive process, itself, does not constitute [discrimination under the ADA]."[94]  Because plaintiff's failure to accommodate claim is time-barred, only her claim that defendant failed to engage in the interactive process remains.  The Third Circuit has repeatedly rejected arguments that employers' failure to engage in the interactive process alone is sufficient to defeat summary judgment, and therefore plaintiff's disability discrimination claim similarly cannot survive summary judgment.[95]

---

[90] *Mercer v. Southeastern Pennsylvania Transit Authority*, 26 F. Supp.3d 432, 442 (E.D. Pa. 2014).

[91] D.I. 56 at 16-7.

[92] *Conneen v. MBNA America Bank, N.A.*, 182 F. Supp.2d 370, 377 (D. Del. 2002) (citing 29 C.F.R. § 1630.2(o)(3)).

[93] *Id.* (citing *Taylor v. Phoenixville School District*, 184 F.3d 296, 319-20 (3d Cir. 1999)).

[94] *Hohider v. United Parcel Services, Inc.*, 574 F.3d 169, 193 (3d Cir. 2009) (citing *Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 359 (3d Cir. 2002)).

[95] *Id.* (citing *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 233-34 (3d Cir. 2000)).

### 2.    Sex-Based and Racial Discrimination

Again, defendant concedes the first three prongs of a prima facie discrimination

case with respect to plaintiff's sex-based and racial discrimination claims.[96]  The parties

disagree on the fulfillment of the fourth prong:  whether there was an adverse

employment action that occurred under circumstances giving rise to an inference of

illegal discrimination.[97]  The fourth prong can be demonstrated by showing "similarly

situated individuals who were not members of the protected class were more favorably

treated than the plaintiff."[98]  To be valid comparators, employees need not be

"identically situated," but must be similar in "all relevant respects."[99]  In determining if

employees are similarly situated, the court must undertake "a fact-intensive inquiry

based on a whole constellation of factors" including whether "the two employees dealt

with the same supervisor, were subject to the same standards and had engaged in

similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them."[100]

Plaintiff argues defendant had discriminatory motives behind two adverse

employment actions:  (1) assigning her to the Bremerton TDY while excusing Ms. Carey

and (2) reassigning cases to her, contrary to company policy, beginning in October

---

[96] D.I. 54 at 13-16.

[97] *Id.*; D.I. 56 at 18-20.

[98] *Mitchell v. City of Pittsburgh*, 995 F. Supp.2d 420, 430 (W.D. Pa 2014) (citing *Nguyen v. AK Steel Corp.*, 735 F. Supp.2d 346, 361 (W.D. Pa 2010)).

[99] *Id.* at 431 (citing *Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009) (internal quotations omitted)).

[100] *Id.* (quoting *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 306 (3d Cir. 2004); *McCullers v. Napolitano*, 427 Fed. Appx. 190, 195 (3d Cir. 2011)).

2013.[101]  Plaintiff contends these instances raise an inference of illegal discrimination because individuals not part of the protected class were treated more favorably than her.[102]

Plaintiff, as an African American woman, is a member of a protected class.[103] She claims Ms. Carey, a Caucasian colleague who was also a level I field investigator, successfully appealed to her manager to be excused from the Bremerton TDY, while plaintiff was told the assignment was "non-negotiable."[104]  However, plaintiff and Ms. Carey are not valid comparators.  To be a valid comparator, employees must be similar in "all relevant respects."[105]  While Ms. Carey and plaintiff were employed in the same position, the reasons that they sought to be excused differed.[106]  Ms. Carey's request was based on family issues and concerns.[107]  Plaintiff planned to celebrate her birthday with her mother in Las Vegas rather than in Bremerton.[108]  Because Ms. Carey and plaintiff's reasons differed, which is a relevant factor in comparing these employees, they are not valid comparators.

Even if Ms. Carey and plaintiff *were* valid comparators, plaintiff's assignment to

---

[101] D.I. 56 at 19-20.

[102] *Id.*

[103] *Id.* at 18.

[104] *Id.* at 19-20.  *See also* D.I. 60, Ex. O-Ex. P.

[105] *Mitchell v. City of Pittsburgh*, 995 F. Supp.2d 420, 431 (W.D. Pa. 2014) (quoting *Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009)).

[106] *Compare* D.I. 54, Ex. A at 156 *with* D.I. 57, Ex. I.

[107] D.I. 54, Ex. A at 156.

[108] D.I. 57, Ex. I (plaintiff's communication to Sellers: "I do not wish to spend my birthday in Washington so please find another body," and her writing to Ms. Carey: "I was wondering if you were still joining me in Washington.  Since my birthday plans in Vegas are now screwed, I wanted to know if maybe we could have dinner or something in Washington.  Not sure if there are any exciting things to do in Washington").

the Bremerton TDY is not an adverse employment action. An adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[109] Plaintiff was assigned to a TDY, albeit at a location that she did not initially volunteer for or prefer, which is consistent with her regular work.[110] Because this assignment does not impact her benefits or responsibilities, it does not constitute an adverse employment action.[111]

Plaintiff also claims her workload manager, Mullane, reassigned her work that was originally assigned to her white male colleagues, even though work policy dictated that the original assignee complete the work.[112] To be an adverse employment action, there must be a significant change in employment.[113] While reassignment *can* be an adverse action, it must come with "significantly different responsibilities."[114] Here, plaintiff was reassigned work which was similar and had the same responsibilities.[115] Therefore, these reassignments are not adverse employment actions.

Because plaintiff is unable to raise an inference of discrimination necessary to demonstrate a prima facie case of discrimination and her failure to accommodate claim

---

[109] *Reynolds v. Department of Army*, 439 Fed. Appx. 150, 153 (3d Cir. 2011) (quotations omitted).

[110] D.I. 54 at 3; D.I. 57, Ex. A at 122-41; D.I. 60, Ex. N, Ex. R.

[111] D.I. 57, Ex. A at 122-41. *See also Walker v. Centocor Ortho Biotech, Inc.*, 558 Fed. Appx. 216, 220-21 (3d Cir. 2014) (considering whether an action was an adverse employment action and, determining that it was not, granting summary judgment for defendant).

[112] D.I. 56 at 19-20.

[113] *See Reynolds*, 439 Fed. Appx. at 153.

[114] *Id.*

[115] D.I. 54 at 2; D.I. 57, Ex. C at 18-9.

15

is time-barred, plaintiff's motion for summary judgment regarding these claims should be denied.

**B.     Defendant's Motion for Summary Judgment**

      **1.     Discrimination**

Plaintiffs must show the following elements to demonstrate a prima facie case of discrimination:  "(1) he or she was a member of a statutorily-protected class; (2) he or she was qualified for the position; (3) he or she was aggrieved by an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of illegal discrimination."[116]  The parties' disagreement centers on the fourth element.[117]  Defendant notes plaintiff alleges discrimination in the following instances:  termination, missed performance evaluation, transfer to Delaware, reduced workload, and increased workload.[118]  For all instances, defendant contends plaintiff cannot raise an inference of discrimination.[119]

Initially, defendant notes plaintiff was terminated because she refused to participate in a call with Human Resources after a long, strained relationship with defendant.[120]  Plaintiff counters that several individuals on this call knew of her complaints of discrimination based on race and sex.[121]  Therefore, plaintiff argues, the reasonable jury could find discrimination based on disability, race, or sex under the

---

[116] *Venter v. Potter*, 694 F. Supp.2d 412, 422 (W.D. Pa. 2010).
[117] D.I. 54 at 12-3.
[118] *Id.* at 12.
[119] *Id.* at 13-6.
[120] *Id.* at 13.  *See also* D.I. 57, Ex. I, Ex. M, Ex. R; D.I. 60, Ex. X.
[121] D.I. 58 at 14-5.

presumption in *Venter v. Potter*.[122]  Plaintiff misconstrues *Venter* as "direct[ing] that

there is a presumption that the adverse employment action occurred due to the

consideration of impermissible factors."[123]  The presumption in *Venter* arises only *after*

plaintiff establishes a prima facie case.[124]  In *Venter*, the court found since the plaintiff

was unable to articulate the grounds for alleged discrimination, he failed to establish a

prima facie case of discrimination.[125]  Here, as in *Venter*, plaintiff has not articulated any

reason to believe that the individuals involved in the teleconference were prejudiced

against the disabled, women, or African Americans.[126]  Thus, plaintiff fails to raise an

inference of discrimination in her termination.

Plaintiff also claims defendant discriminated against her by neglecting to

complete her performance evaluations.[127]  However, such conduct is not a meaningful

adverse employment action that results in a significant change in employment

comparable with firing or other employment actions that substantially affect benefits.[128]

Therefore, plaintiff's missing performance evaluations do not satisfy the fourth prong of

demonstrating a prima facie case of discrimination.

With regard to her transfer to Delaware, defendant argues plaintiff cannot

---

[122] *Id.* at 15.

[123] *Id.*

[124] *Venter*, 694 F. Supp.2d at 422 (noting "*[i]f* the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons") (internal citations omitted) (emphasis added)).

[125] *Id.* at 424-25, 426-27.

[126] D.I. 54, Ex. A at 49, 75, 81.

[127] D.I. 58 at 19.

[128] *See Reynolds v. Department of Army*, 439 Fed. Appx 150, 153 (3d Cir. 2011).

17

compare herself to any similarly situated employees who were treated more favorably

than she was by changing her residence to another state without previously notifying

defendant of her upcoming move.[129]  Although plaintiff violated company policy by

neglecting to notify defendant, defendant continued to pay plaintiff at the higher rate

she enjoyed while she lived in Maryland and to which *she was no longer entitled* after

her moved.[130]  Defendant transferred plaintiff to Delaware after several months of

incurring costs from continued pay at a higher rate, reimbursement for her longer

commute, and overtime.[131]  Plaintiff argues that this decision occurred after she told

defendant that she was suffering from CTS symptoms and a reasonable jury could infer

discrimination based on this knowledge.[132]  However, her supervisors suggested

through an email in March 2014 that she be transferred, while plaintiff notified

defendant about her CTS symptoms in May 2013, almost a year earlier.[133]  These two

instances are not sufficiently temporally close to demonstrate a causal connection that

could give rise to an inference of discrimination.[134]

　　　Plaintiff further contends defendant discriminated by reducing her workload

beginning in March 2012.[135]  Plaintiff cannot compare her situation to how defendant

treated other individuals outside of the protected class and has provided no reason to

---

[129] D.I. 54 at 14-5.
[130] D.I. 54, Ex. A at 269-70.
[131] *Id.*; D.I. 58, Ex. JJ.
[132] D.I. 58 at 16.
[133] D.I. 58, Ex. P, Ex. JJ.
[134] *See Gray v. Barney*, 2016 WL 369360, at *9-10 (D. Del. Jan. 29, 2016) (finding "the temporal proximity of one to two years between [plaintiff's] protected activities and the adverse employment actions of which she complains are not the length of time typically considered as unduly suggestive of a causal connection").
[135] D.I. 1 at 5; D.I. 58 at 16.

believe Kathy Bederka, Mullane's supervisor who ultimately made decisions regarding assignments, was biased. All plaintiff argues is defendant knew of her disability.[136] Plaintiff again relies on her misinterpretation of *Venter*, by merely claiming that her supervisors were aware of her disability, and as a result, there is an inference of unlawful discrimination.[137] Plaintiff's application of *Venter* is misguided: awareness alone of her disability does not give rise to the *Venter* presumption or an inference of discrimination.[138] Therefore, reduction in plaintiff's workload does not support a prima facie case of discrimination.[139]

Finally, plaintiff alleges Mullane reassigned cases to her, although such practice was against company policy, and for which he was repeatedly admonished.[140] Defendant emphasizes that plaintiff's claims of discrimination based on her increased workload are refuted because Mullane was unaware of her race or her health condition, CTS.[141] Additionally, plaintiff has no valid comparator because she moved without giving notice to defendant, while her white male colleagues had not.[142] Therefore, even considering Mullane's reassignment of cases, no inference of discrimination arises.

After considering all instances plaintiff raises as evidencing discrimination, she fails to establish a prima facie case, and defendant's motion for summary judgment on the discrimination claims should be granted.

---

[136] D.I. 54 at 15.
[137] D.I. 58 at 16.
[138] *Venter v. Potter*, 694 F. Supp.2d 412, 422 (W.D. Pa. 2010).
[139] *Id.*
[140] D.I. 58 at 16-7.
[141] D.I. 54 at 16. *See also* D.I. 54, Ex. C at 39.
[142] D.I. 54 at 16.

### 2.    Retaliation

To establish a prima facie case of retaliation, a plaintiff must show:  "(1)
protected employee activity; (2) adverse action by the employer either after or
contemporaneous with the employee's protected activity; and (3) a causal connection
between the employee's protected activity and the employer's adverse action."[143]  This
final element of causation can be proven through "demonstrative proof, such as actual
antagonistic conduct or animus against the employee . . . or other types of
circumstantial evidence, such as inconsistent reasons given by the employer for
terminating the employee or the employer's treatment of other employees, that give rise
to an inference of causation when considered as a whole."[144]

Here, parties disagree on the third prong in this inquiry.[145]  Defendant notes
plaintiff's allegations are rooted in the same instances as her discrimination claims:
termination, missed performance evaluations, transfer to Delaware, reduced workload,
and increased workload.[146]  Defendant also identifies three protected activities as two
requests for accommodations and the 2012 Charge.[147]

Initially, defendant argues plaintiff's termination in April 2014 occurred over one
year after she filed an EEOC charge and more than two years after her last request for

---

[143] *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citing
*Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Stewart v. Happy
Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).
[144] *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 302 (3d Cir. 2007)
(citing *Woodson*, 109 F.3d at 921; *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-
81 (3d Cir. 2000)).
[145] D.I. 54 at 16.
[146] *Id.*
[147] *Id.*

20

accommodation.[148]  Plaintiff admits this conduct is too remote and she cannot prove

causation through temporal proximity.[149]  She suggests defendant's failure to

investigate her complaints, the Bremerton TDY assignment, the reassignment of her

colleagues' work in 2013, and her interactions with supervisors after complaining of

overwork constitute antagonistic conduct and animus that provides circumstantial

evidence sufficient to establish a causal connection.[150]  To find antagonistic conduct

and animus, the conduct must be "consistent and continuous during the intervening

period," and the plaintiff must link each event to her protected activity.[151]  In the instant

matter, plaintiff fails to demonstrate antagonistic conduct and animus.  Defendant did

not investigate plaintiff's complaints and denied her accommodation requests in

2011.[152]  Additionally, her complaints of being overworked were not fully investigated

and met with laughter.[153]  However, her Bremerton TDY assignment and her 2013

assignments are not circumstantial evidence that support a causal connection for her

retaliation claim because her superiors had no knowledge of the 2012 Charge.[154]

Therefore, there are only two isolated incidents - one in 2011 and one in 2013.  As a

result, defendant's actions do not "amount to a pattern of antagonism" because they

---

[148] *Id.* at 17.

[149] D.I. 58 at 18-9.

[150] *Id.* at 19.

[151] *Bartos v. MHM Correctional Services, Inc.*, 454 Fed. Appx. 74, 79 (3d Cir. 2011).

[152] D.I. 58 at 19.

[153] *Id.* at 19; D.I. 54, Ex. A at 295.

[154] D.I. 59 at 5.  *See also* D.I. 54, Ex. C at 40.  *See Warshaw v. Concentra Health Services*, 719 F. Supp.2d 484, 501 (E.D. Pa. 2010) (noting "knowledge of the protected activity is an important ingredient of the causal connection that retaliation plaintiffs must show").

were not consistent and continuous.[155]  Plaintiff is thus unable to provide the causal connection necessary for a prima facie case of retaliation for her termination through circumstantial evidence.

Second, as the court has already concluded, defendant's oversight regarding plaintiff's performance evaluations is not an adverse employment action and does not fulfill the elements required for a prima facie case of retaliation.[156]

Third, defendant argues there is no evidence suggesting plaintiff was going to be transferred to Delaware because she engaged in protected activity.[157]  Plaintiff contends the temporal proximity between her complaint regarding Mullane and defendant's transfer of plaintiff establishes a causal connection sufficient to defeat summary judgment.[158]  However, as noted herein regarding plaintiff's discrimination claim, these instances are about one year apart and not sufficiently temporally close to establish causation.[159]  Plaintiff complained about Mullane in November 2013.[160]  Defendant started planning to transfer plaintiff to Delaware in March 2014.[161]  Four months separate plaintiff's complaint and defendant notification of the transfer.[162]  This gap in time between plaintiff's actions and defendant's alleged retaliation is insufficient to

---

[155] *Bartos*, 454 Fed. Appx. at 79.
[156] *See Walker v. Centocor Ortho Biotech, Inc.*, 558 Fed.Appx. 216, 220-21 (3d Cir. 2014).
[157] D.I. 54 at 18.
[158] D.I. 58 at 20.
[159] *See Gray v. Barney*, 2016 WL 369360, at *9-10 (D. Del. Jan. 29, 2016).
[160] D.I. 54, Ex. A at 295-96.
[161] D.I. 54, Ex. V.
[162] *Compare* D.I. 54, Ex. A at 295-96 *with* D.I. 54, Ex. V.

establish a causal connection.[163]  Therefore, plaintiff cannot satisfy the third element

required for a prima facie case of retaliation concerning her transfer to Delaware.

Fourth, plaintiff claims Bederka, Mullane's superior, reduced her workload

because of her requests for accommodation in March and November 2011.[164]

Defendant notes there is no evidence that Bederka knew of plaintiff's CTS or her

requested accommodations.[165]  Even assuming Bederka had this knowledge, defendant

argues, the period of time between plaintiff's November 2011 request and her March

2012 workload reduction was not suggestive of a causal connection necessary for

retaliation.[166]  Plaintiff fails to produce evidence that Bederka knew of either her

disability or her requests for accommodation.[167]  Moreover, assuming *arguendo*,

Bederka knew of plaintiff's disability and requests for accommodation, four months

between plaintiff's request and the alleged retaliation is insufficient to establish a causal

link.[168]  Therefore, plaintiff fails to establish the third element necessary for a prima facie

case of retaliation with regards to reduction in her workload.

Finally, defendant reasons plaintiff cannot meet the third element of a prima

facie case of retaliation based on an increased workload for similar reasons noted

---

[163] *See Oberdorf v. Penn Village Facility Operations, LLC*, 2017 WL 839470 at *4 (M.D. Pa. Mar. 3, 2017) (concluding "[a] lapse of three or four months is insufficient to establish unusually suggestive temporal proximity. 'Although there is no bright line rule,' the Third Circuit has not found any period longer than three weeks so 'unduly suggestive' of retaliatory animus that it was sufficient to establish causation without other evidence" (internal quotations omitted)).

[164] D.I. 54 at 18; D.I. 58 at 20.

[165] D.I. 54 at 18.

[166] *Id.*

[167] *See* D.I. 58 at 20.

[168] *See Oberdorf*, 2017 WL 839470, at *4 (finding four months insufficient to establish causal connection).

above.[169]  Mullane was unaware of her EEOC charge and, if he were aware, the

temporal proximity between plaintiff's EEOC charge and the alleged retaliatory conduct

was not unduly suggestive.[170]  Plaintiff argues a temporal link exists relying on the time

frame between her complaints about Mullane and her increased workload.[171]  Plaintiff

provides no evidence that Mullane knew of plaintiff's EEOC charge.  In fact, the

evidence suggests the opposite.[172]  Plaintiff filed her EEOC charge in November

2012.[173]  Mullane did not become plaintiff's workload manager until October 2013.[174]

Eleven months between plaintiff's EEOC charge and the increase in her workload does

not establish the causal connection required for the third prong to establish a prima

facie case of retaliation.[175]  Between plaintiff's complaints regarding Mullane in

November 2013 and the increase in her workload, almost a year exists, which fails to

show a causal connection through temporal proximity.[176]  Although plaintiff argues

causation may be shown through defendant's animus and antagonistic conduct,[177] there

is no evidence that Mullane had knowledge of the 2012 Charge.  Therefore, there is no

retaliatory motive for this claim.[178]

---

[169] D.I. 54 at 12.
[170] *Id.* at 19.
[171] D.I. 58 at 21.
[172] D.I. 54, Ex. C at 40.
[173] D.I. 57, Ex. J.
[174] D.I. 54 at 19.
[175] *See Gray v. Barney*, 2016 WL 369360, at *9-10 (D. Del. Jan. 29, 2016) (finding one to two years between protected activity and allegedly retaliatory action as too temporally remote to establish a causal connection).
[176] *Id.*; D.I. 56, Ex. Y.
[177] D.I. 58 at 21.
[178] D.I. 54, Ex. C at 40.  *See Warshaw v. Concentra Health Services*, 719 F. Supp.2d 484, 501 (E.D. Pa. 2010) (noting "knowledge of the protected activity is an important ingredient of the causal connection that retaliation plaintiffs must show").

24

Since plaintiff fails to meet the causation element for a prima facie case of retaliation through any of her offered circumstances, defendant's motion for summary judgment should be granted on plaintiff's retaliation claim.

### 3.    Failure to Accommodate

Defendant contends plaintiff's failure to accommodate claim is time-barred.[179] As previously discussed, plaintiff cannot pursue this claim because she filed the 2012 Charge more than 300 days after defendant denied her request for accommodation.[180] Therefore, defendant's motion for summary judgment on the failure to accommodate claim should be granted.

### 4.    Hostile Work Environment

To establish a prima facie case of hostile work environment, a plaintiff must demonstrate: "(1) she suffered intentional discrimination because of [a protected classification]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same [protected classification] in [her] position; and (5) there is a basis for employer liability."[181] Such intentional discrimination must be "severe or pervasive."[182] Courts must consider the totality of the circumstances, and should not

---

[179] D.I. 57 at 10; D.I. 54 at 23-4.

[180] *Compare* D.I. 54 at 23-4 *with* D.I. 56 at 4-5 *and* D.I. 57, Ex. J.

[181] *Garnett v. Bank of America*, 2017 WL 1074358, at *5 (D. Del. 2017) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (internal quotations omitted)).

[182] *Hemphill v. City of Wilmington*, 813 F. Supp.2d 581, 587 (D.Del. 2011) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990); *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006)).

examine the scenario on an incident-by-incident basis.[183] "[I]solated or single incidents of harassment are *insufficient* to constitute a hostile environment."[184]

Defendant identifies eight circumstances that plaintiff relies on to support her hostile work environment claim.[185] These circumstances include: (1) Williams failing to transfer plaintiff's work assignments while she was undergoing medical treatment in 2011, (2) defendant not investigating her 2011 grievance against Williams, (3) the Las Vegas TDY, (4) alleged unfavorable treatment treated because plaintiff had to work in Baltimore, (5) defendant's CPO email to plaintiff, purporting she no longer suffered from CTS and asserting defendant had no record of requests for accommodation, (6) defendant initially denying plaintiff a "fleet vehicle" and then later offering her one, (7) Orton's "unsolicited email" requesting plaintiff complete her assignments, and (8) Orton laughing at plaintiff's inquiry if one could be retaliated against through workloads.[186]

Because this court has already concluded defendant's motion for summary judgment regarding plaintiff's discrimination claims should be granted, the first element of a prima facie case of hostile work environment cannot be fulfilled. Thus, defendant's motion for summary judgment regarding plaintiff's hostile work environment claim should similarly be granted.

### 5.    Breach of Covenant of Good Faith and Fair Dealing

An employee can bring a claim for breach of the implied covenant of good faith

---

[183] *Bishop v. National R.R. Passenger Corp.*, 66 F. Supp.2d 650, 663 (E.D. Pa. 1999) (citing *Andrews*, 895 F.2d at 1485).
[184] *Id.* (quoting *Rush v. Scott Specialty Gases*, 113 F.3d 476, 482 (3d Cir. 1997) (emphasis added)).
[185] D.I. 54 at 24-5.
[186] *Id.*

and fair dealing where: (1) termination violated public policy, (2) the employer misrepresented an important fact and the employee relied on the misrepresentation either to accept a new position or remain in the current one, (3) the employer used its superior bargaining power to deprive an employee of a clearly identifiable compensation related to the employer's past service, or (4) the employer falsified or manipulated employment records to create fictitious grounds for termination.[187]

Delaware's Discrimination Employment Statute ("DDES") prohibits discrimination in employment practices and serves as the "'sole remedy' for an aggrieved employee 'to the exclusion of all other remedies.'"[188] Here, plaintiff's arguments center on claims that she was treated unequally compared to her colleagues who were not part of the same protected class.[189] As a result, the breach of covenant and fair dealing is precluded under Delaware law.[190] Therefore, defendant's motion for summary judgment on the breach of the covenant of good faith and fair dealing claim should be granted.

## V.    CONCLUSION

For the foregoing reasons, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 55) be denied; and

(2) Defendant's motion for summary judgment (D.I. 53) be granted.

---

[187] *Saunders v. E.I. DuPont de Nemours and Company*, 2017 WL 679853, at *9 (D. Del. 2017) (citing *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 441-44 (Del. 1996)).

[188] *Id.* (citing 19 Del. C. § 712(b); *E.E.O.C. v. Avecia, Inc.*, 151 Fed.Appx. 162, 165 (3d Cir. 2005)).

[189] *See generally* D.I. 1; D.I. 56.

[190] *Compare* D.I. 1 at ¶ 92 *with Saunders*, 2017 WL 679853 at *9.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  Objections and responses are limited to ten (10) pages each.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Dated: July 18, 2017

<u>Mary Pat Thynge</u>
United States Magistrate Judge

28